**Moore v. Berks County Board of Assessment Appeals**

C.P. of Berks County, no. 04-2884.

*Cheryl J. Allerton* and *Barbara Jean Kern,* for appellants.

*John E. Muir,* for appellee.

LASH, *J.,* May 5, 2005—The appellants, Michael H. Moore and Andrea Wardenski Moore, have filed an appeal from the decision of the Berks County Board of Assessment Appeals, directing a rollback from the preferential use assessment to full market value assessment of three parcels of Moores' real estate, pursuant to Pennsylvania Farmland and Forest Land Assessment Act of 1974 (Act 319), commonly known as the Clean and Green Act, 72 P.S. §5490.1, et seq. Pursuant to 72 P.S. §5350(c), the appeal pertains to a rollback from preferential use assessment to full market value for the years 1997 through 2003 for Parcel 1, and 1998 through 2003 for Parcels 2 and 3. Trial was held on November 29, 2004 and March 2, 2005. The court makes the following findings:

## I. FINDINGS OF FACT

(1) The appellants are Michael H. Moore and Andrea Wardenski Moore, with an address at 120 Old State Road, Reading, Berks County, Pennsylvania 19606.

(2) The appellee is the Berks County Board of Assessment Appeals, having an address at the Berks County Services Center, Third Floor, 633 Court Street, Reading, Berks County, Pennsylvania 19601.

(3) At all pertinent times, the Moores were the owners of three parcels of real estate situated entirely within Alsace Township in the Oley Valley School District, totaling 90.94 acres as follows:

(A) 62.63 acres, located at 120 Old State Road, pin no. 22-5338-04-54-7554 (Parcel 1);

(B) 15.88 acres, located at Apple Lane, pin no. 22-5338-01-45-2364 (Parcel 2); and

(C) 12.43 acres, also located at Apple Lane, pin no. 22-5338-01-45-5425-001 (Parcel 3).

(4) Parcel 1 has an assessed value of $460,800, Parcel 2 has an assessed value of $55,600 and Parcel 3 has an assessed value of $43,500.

(5) In 1976, appellant, Michael H. Moore, purchased approximately 89 acres from his father and continued its use as a farm. The farming operation included hogs, corn, soybeans, winter wheat and hay. In 1990, the Moores discontinued the hog farming operation. They eventually also eliminated the growing of hay.

(6) This original 89-acre farm has been known and referred to as "Shamrock Farm" since 1981.

(7) The farm included the farm residence and garage, five outbuildings, which were used to house the hogs and store crops and farm equipment, as well as tillable land, pasture and woodland.

(8) The outbuildings existing on the property in 1976 are identified in exhibit B-4 as buildings A, B, D, E and H. Buildings A, B, D and E were used to house livestock, and building H was used to house farm equipment.

(9) Subsequently, the Moores constructed additional outbuildings, also identified in exhibit B-4. Building G was constructed shortly after appellant, Michael H. Moore, purchased the premises and was used as a garage to house personal automobiles. Building F was constructed in 1994 and was originally used to store personal vehicles. Buildings I and J were constructed in 1996 and were used for the storage of personal items and farming equipment. Building K was constructed in 1997 and was originally used for the storage of personal items and farming equipment. Building C was constructed in 1998 and was originally used for the storage of personal items and farming equipment.

(10) Eventually, outbuildings C, F, I, J and K and partitioned portions of outbuildings A and D were converted from their existing use to a commercial use, whereby the Moores would provide storage space to third parties.

(11) The Moores began renting building F to third parties in 1998, buildings I, J and K sometime between 1999 and 2001 and building C in 2001. The Moores also rented portions of buildings A and D to third parties at all pertinent times.

(12) The square footage used in the outbuildings for storage space to third parties totals 21,910 square feet.

(13) In 1995, the Moores purchased a parcel of land of approximately nine acres from Mr. Moore's brother. This land adjoined Shamrock Farm. The Moores annexed the nine acres to Shamrock Farm.

(14) Subsequently, the Moores subdivided Shamrock Farm and the annexed nine acres into four lots, one of which was sold off. The remaining three lots became Parcels 1, 2 and 3.

(15) Parcel 2 is composed of 13.71 acres from Shamrock Farm and 2.170 acres from the farm previously owned by Mr. Moore's brother. Parcel 3 is composed of 9.84 acres from Shamrock Farm and 2.590 acres from the farm previously owned by Mr. Moore's brother.

(16) All buildings, including the Moores' residence and garage and the 11 outbuildings, are situated within Parcel 1.

(17) Also located on Parcel 1 is a network of driveways leading from Old State Road. The driveways are utilized by the Moores for their personal, farming and forest reserve uses, and are also used by the Moores' commercial patrons.

(18) The original driveway, known as the "lower driveway," leading from Old State Road to the dwelling house, was constructed in the mid 1950s. Another driveway, known as "the middle driveway," was constructed in about 1966 to serve outbuilding A. The Moores next constructed the "end driveway" in 1996, which extended from the dwelling house to the northwest to facilitate access to the tilled fields. Finally, the driveway known as the "top driveway" was constructed, connecting the ends of the existing driveways, facilitating access to outbuildings I and J.[1]

(19) On or about November 2, 1992, and prior to the Moores acquiring the adjoining lot from Mr. Moore's brother or subdividing the acreage, the Moores submitted an application to the Berks County Board of Assessment, requesting that the 89-acre farm be given prefer-

---

1. The driveway system appears on exhibit M-15 in the light blue, shaded area.

ential assessment under the Clean and Green Act, commencing tax year 1994.

(20) On the application, the Moores allotted the acreage as follows: one acre designated "homesite," 30 acres designated "tillable," four acres designated "pasture," 50 acres designated "forest," and four acres designated "residual." Nothing was designated as "other ineligible" land.

(21) The application defined "homesite" as "normally one acre is required for each occupied house. A farm with one house, barn and outbuildings require one acre." It defined "ineligible land" as: "The acres necessary to support any non-agricultural use, for example: *commercial operation of a business, including a parking lot.*" (emphasis in original) "Residual" was defined as: "The number of remaining acres of land which are not suitable for building sites, agricultural or forest land use. Normally restricted to swamp lands, ravines, etc."

(22) The four acres allocated by the Moores to "residual" on the application consisted of the acreage where the then existing outbuildings, and the sites of future outbuildings, were located. A stream bed and small pond were also included within the four acres.

(23) By notice dated October 28, 1993, the Berks County Assessment Office notified the Moores that their application for enrollment into the Clean and Green program had been accepted, effective January 1, 1994.

(24) Following the annexation and subdivision that created Parcels 2 and 3, the Moores applied for enrollment of those Parcels into the Clean and Green program. Specifically, the application requested preferential use

for 4.76 acres, acreage which was originally from Mr. Moore's brother's property, and which had been included with part of Shamrock Farm to form Parcels 2 and 3. The eligible acreage was designated "forest."

(25) By notice dated September 19, 1997, the Assessment Office notified the Moores that the application for Parcels 2 and 3 had been accepted into the Clean and Green program, effective January 1, 1998.

(26) Act 156 of 1998 was passed on December 21, 1998, and amended the Clean and Green Act. Section 5490.8(d)(1) of the Clean and Green Act[2] now provides, in pertinent part: "a landowner may apply a maximum of two acres of a tract of land subject to preferential assessment toward direct commercial sales of agriculturally related products and activities or for a rural enterprise incidental to the operational unit without subjecting the entire tract to rollback taxes, provided that: . . . (iii) the rural enterprise does not permanently render the land incapable of producing an agricultural commodity."

(27) By notices dated November 10, 1999, the Assessment Office advised the Moores for the first time that the assessed value of their real estate would change pursuant to Act 156. The new assessment would go into effect January 1, 2000, for the 2000 tax year.

(28) By notices dated November 8, 2002, the Assessment Office advised the Moores that the assessed value of their real estate would change pursuant to Act 156. The assessment would go into effect January 1, 2001, for the 2001 tax year.

---

2. 72 P.S. §5490.8(d)(1).

(29) By notices dated October 31, 2001, the Assessment Office advised the Moores that the assessed value of their real estate would change pursuant to Act 156. The assessment would go into effect January 1, 2002, for the 2002 tax year.

(30) By correspondence dated November 25, 2003, the Assessment Office notified the Moores of a breach of the Clean and Green Act. The correspondence stated, in part: "As a result of the rural enterprise covering more than 2.00 acres, the agreement covering the entire tract has been breached. Under the provisions of Act 319, this change is subject to a penalty, which is based on the difference between the market value assessment and the preferential assessment."

(31) As a result of the alleged Clean and Green breach, the Assessment Office imposed rollback taxes for seven years on Parcel 1 and for six years on Parcels 2 and 3, totalling $52,519.04, plus interest and recording fees.

(32) The Moores appealed the rollback tax assessment to the board. The board held a hearing on the Moores' appeal on January 26, 2004, and rendered a written decision on February 2, 2004, finding that the Moores breached their Clean and Green agreement and upholding the assessment of the rollback taxes on all of the real estate.

(33) On or about February 10, 2004, the Moores paid $52,795.97 for the assessed rollback taxes, interest and recording fees.

(34) On March 1, 2004, the Moores appealed the board's decision to this court.

(35) The Moores have not reapplied for enrollment of Parcel 1 in the Clean and Green program, pending the outcome of their appeal to this court.

(36) Subsequently, on April 1, 2004, the Moores sold Parcels 2 and 3.

## II. DISCUSSION

In determining that the Moores' Parcels are subject to rollback tax, the board argues that the Moores' 1992 application for preferential assessment was defective for failing to designate the commercial portion of Shamrock Farm as "ineligible land." Because of this improper designation, the commercial acreage was included within the preferential assessment when the Assessment Office accepted the application for enrollment. The board concludes that the Moores' application misled the Assessment Office and should not have been approved.

The board also claims that Parcels 2 and 3, both of which consisted of combined acreage from Shamrock Farm and the parcel purchased from Mr. Moore's brother, should not have been enrolled into the Clean and Green program, because the acreage coming from Shamrock Farm is ineligible. In essence, Parcels 2 and 3 could not be considered contiguous under section 5490.7 of the Clean and Green Act because the Shamrock Farm acreage was already ineligible. Further, considering only the portions of Parcels 2 and 3 which came from Mr. Moore's brother's land, there is insufficient acreage to comply with the minimum acreage requirement under section 3 of the Clean and Green Act.[3]

Certainly, had the Moores accurately completed the 1992 application, all the eligible land, including Parcels 2 and 3, as contiguous land under section 5490.7, would

---

3. 72 P.S. §5490.3.

have qualified as land subject to preferential use assessment. The portion of Shamrock Farm/Parcel 1, designated for commercial use, would have been fully assessed. See *McLoughlin v. Bradford County Board of Assessment,* 130 Pa. Commw. 409, 568 A.2d 721 (1989). Further, there was no change of use,[4] nor split- off by the Moores, which would have disqualified the eligible acreage.

Mr. Moore contended in his testimony that the inaccuracy in the application was inadvertent and due to his own confusion. He attended a meeting held by the Assessment Office for landowners interested in applying for preferential use assessment under the Clean and Green Act. He testified that the procedures were not made clear to him at that time. Accordingly, when he included the commercial acreage under the "residual" category rather than "other ineligible," he believed he was properly filling out the application.

The first question is whether an application for preferential use assessment can be amended retroactively to accurately set forth land designations, where, due to the inadvertence of the owner, between 86 to 88 acres of a 90-acre parcel are eligible for preferential assessment, but the remaining two to four acres which are ineligible are improperly designated as residual.

The primary purpose of the Clean and Green Act is to preserve the important and dwindling natural resource

---

4. Over time, the Moores did change the use of some of the outbuildings from personal to commercial use. From a comprehensive standpoint, however, the commercial use was already present at the time of the 1992 application.

of agricultural land and forestry. This is accomplished through the Act providing incentive to the landowner in the nature of a reduction in his property tax to cause him to ignore the development value of the land and preserve the land in its current state. *Feick v. Berks County Board of Assessment Appeals,* 720 A.2d 504, 506-507 (Pa. Commw. 1998). Here, this purpose was met through the Moores' application. Since 1992, 86 to 88 acres owned by the Moores have been reserved for agricultural or forest use.

We also note, however, that section 5490.4(a.1) expressly requires "a complete and accurate application," which the County Assessment Office shall then accept. It is fundamental that the completed application be accurate to prevent fraud and to preserve the integrity of the preferential use process. It is not feasible, nor required, for the Assessment Office to check into the accuracy of each application prior to acceptance and enrollment.

Further, the Clean and Green Act does not expressly provide any authority for amending an application for preferential assessment to modify or correct an application.

We agree with the board that the presence of the material inaccuracy in the application for enrollment resulting in noneligible acreage being included for preferential use should result in a disqualification of the entire tract previously approved for preferential assessment. To hold otherwise is to welcome irresponsible and even fraudulent preparation of applications, fraught with mistakes which the landowner could argue should be corrected only after it is discovered.

We note by analogy section 5490.5(a) of the Clean and Green Act,[5] which deals with penalties for ineligible use. Under that provision, when a landowner changes the use of a tract of land from eligible to ineligible, the affected tract, and the entire tract of which it was a part, is subject to rollback taxes. If land which is properly enrolled under the Clean and Green Act is subject to rollback taxes due to a change in use, it is also appropriate to terminate preferential assessment when the initial application improperly includes ineligible land in its request for preferential assessment.

Further, we are not persuaded by the Moores' argument that the inaccurate enrollment is excused under the provisions of 7 Pa. Code §137(b).52(f). That provision states:

"If a county assessor erroneously allowed the enrollment of land that did not, at the time of enrollment, meet the minimum qualifications for preferential assessment, the county assessor shall, in accordance with section 3(d)(2) of the Act, provide the landowner written notice that preferential assessment is to be terminated. The notice shall state the reasons for termination and afford the landowner the opportunity for a hearing. If the use of the land was not an eligible use at the time it was enrolled and preferential assessment is terminated for that reason, no rollback taxes shall be due from the landowner as a result."

This provision contemplates improper action by the county assessor. Here, the error was committed by the Moores. Their error misled the County Assessment Of-

---

5. 72 P.S. §5490.5(a).

fice. As already stated, the Assessment Office cannot be charged with investigating every tract proposed to be enrolled for preferential assessment. It is only when the Assessment Office is responsible for the error, such as where a landowner properly designates acreage as ineligible but the Assessment Office improperly enrolls that acreage for preferential assessment, can this provision be implemented to excuse payment of rollback taxes.

Nevertheless, the amount of rollback taxes imposed was improper and the board must be reversed in part because the notice provided to the Moores advising them of the imposition of rollback taxes was materially defective.

Section 5490.3(d)(2) of the Clean and Green Act[6] states:

"(d) the County Board of Assessment Appeals may not terminate preferential assessment of land previously determined by the board to qualify for preferential assessment without: . . .

"(2) written notice under section 5(a)(2) from the county assessor to the landowner that preferential assessment is to be terminated, stating the reason for such termination and the opportunity for a hearing under section 9."

This section, as well as section 5(a)(2),[7] to which it refers, requires that the notice state the reason for the termination. This requirement is not a mere technicality, but is a necessary measure to provide sufficient infor-

---

6. 72 P.S. §5490.3(d)(2).
7. 72 P.S. §5490.5(a)(2).

mation to a landowner of the issues affecting his preferential use assessment, and enabling him to prepare an effective appeal. The notice requirement protects the procedural rights of the landowner whose property interests may be affected by the outcome. Further, the notice requirement is couched in mandatory language.[8]

The notice provided to the Moores from the Assessment Office, dated November 25, 2003, states, in relevant part: "As a result of the rural enterprise covering more than 2 acres, the agreement governing the entire tract has been breached. Under the provisions of Act 319, this change is subject to a penalty, which is based on the difference between the market value assessment and the preferential assessment."

As is apparent, no mention is made in the notice of the inaccuracy in the Moores' 1992 application. Accordingly, the board's action in relying on the inaccurate application as a basis for its determination was improper. Given that the inaccuracy may be little more than an inadvertent technical flaw, the Assessment Office should not be permitted to insist on termination on this basis without itself being in compliance with the Clean and Green Act. We hold that the preferential assessment cannot be terminated on the basis of the inaccurate application, due to the failure of the Assessment Office to properly notify the Moores of this basis for termination.

The notice does advise the Moores of the Assessment Office's position that section 5490.8(d)(1) of the Clean

---

8. Note section 5490.5(a) which states that it *shall* be the duty of the county assessor, inter alia, to notify, in writing, the landowner of any preferential assessments terminated and the reason for termination within five days of such change.

and Green Act, relating to "rural enterprise," was breached. That section states, in pertinent part:

"a landowner may apply a maximum of two acres of a tract of land subject to preferential assessment toward direct commercial sales of agriculturally related products and activities or for a rural enterprise incidental to the operational unit without subjecting the entire tract to rollback taxes, provided that: . . . (iii) the rural enterprise does not permanently render the land incapable of producing an agricultural commodity."

We note, preliminarily, that, since the Assessment Office's notice limits termination of preferential assessment to breach of the rural enterprise provision, the rollback taxes must be recalculated. Act 156, which amended the Clean and Green Act, was first implemented in Berks County in 2000. Accordingly, rollback taxes cannot be assessed on this basis for the years 1997, 1998 and 1999. Secondly, to the extent the rural enterprise provision was breached, this breach affects Parcel 1 only. The Moores' commercial enterprise never involved Parcels 2 and 3. Accordingly, Parcels 2 and 3 are not subject to rollback taxes.

We turn then to the final question, whether the Moores may continue to enjoy preferential use assessment of the land under the rural enterprise provision. It is well established that a statute exempting persons or properties from taxation must be strictly construed against the taxpayer. Section 1928(b)(5) of the Statutory Construction Act of 1972, 1 Pa.C.S. §1928(b)(5); *Deigendesch v. County of Bucks,* 505 Pa. 555, 482 A.2d 228 (1984). This rule of statutory construction applies to the Clean and Green Act. *Hydrusko v. County of Monroe,* 699 A.2d 828, 831 (Pa. Commw. 1997). Further, to qualify for a tax

exemption, the landowner bears the burden of bringing himself within the ambit of the exemption. *Presbyterian-University of Pennsylvania Medical Center v. Board of Revision of Taxes,* 24 Pa. Commw. 461, 464, 357 A.2d 696, 698 (1976).

We find that the commercial use of the property by the Moores does not qualify as a rural enterprise. A rural enterprise must be "incidental to the operational unit." The Moores operate Parcel 1 as a farm. The commercial use consists of rentals of storage space to third parties.

Black's Law Dictionary defines "incidental use," in the context of zoning, as "use of premises which is dependent on or affiliated with the principal use of such premises." [9] The rural enterprise provision contemplates a similar relationship between the rural enterprise and the operational unit. Here, the commercial use is neither dependent on nor affiliated with the principal use and, in fact, is totally unrelated to the Moores' farming operation.

Whether the Moores' commercial operation is contained within two acres or less of the tract is also questionable. The Moores presented testimony from David W. Silberman, a professional land surveyor, who testified that the square footage of the buildings used for commercial purposes was 21,910 square feet. (N.T., March 2, 2005, p. 18.) The driveway network accessing the buildings was measured at 1.422 acres. (N.T., March 2, 2005, p. 21.) Thus, the total area of the buildings and the paved access areas totaled 1.924 acres. (N.T., March 2,

---

9. Black's Law Dictionary, 6th ed., St. Paul, Minnesota, West Publishing Company 1990, p. 762.

2005, p. 21.) However, if you include the grassy areas among the driveway network as well, the total acreage increases to 4.28 acres, established by the board's exhibit B-3.

The Moores claim that the driveway network and the grassy areas should not be considered part of the commercial use, but rather should be included as "farmstead land" and "curtilage" as defined by section 5490.2 of the Clean and Green Act.[10] "Farmstead land" is defined under that section as "any curtilage and land situated under a residence, farm building or other buildings which supports a residence, including a residential garage or workshop." "Curtilage" is defined as "the land surrounding a residential structure and farm building use for a yard, driveway, on-lot sewage system or access to any building on the tract."

The network of driveways supports both the Moores' personal and farming operation needs and the commercial use. To gain access to the outbuildings, tenants drive their vehicles on the paved cart ways. Regarding the grassy areas, the Moores indicated that these areas could be used for pasture lands. However, it appears that the land is not used for any purpose other than possibly short-term parking for the tenants. According to Judith R. Barr, an employee of the Assessment Office, the grassy areas were basically unusable land, and were terraced. (N.T., March 2, 2005, p. 6.)

For land to qualify for preferential use, the land must be used exclusively for an eligible purpose. Land which serves both eligible and ineligible uses cannot qualify

---

10. 72 P.S. §5490.2.

for preferential status. Accordingly, the driveway network acreage must be deemed ineligible. Further, the grassy areas, which appear to support the commercial use and not the farmland use, is also ineligible acreage. The Moores claim that the commercial or "rural enterprise" is limited to less than two acres is not supported by law.

Even assuming the grassy areas would not be included in the commercial use acreage, the Moores have, nevertheless, failed to sustain their burden that the building and driveway network is less than two acres. As stated, Mr. Silberman found this acreage to be 1.924 acres, in other words, short of two acres by 3,311 square feet. His method in reaching this figure was inexact, however. He estimated based on the scale of the drawings he had prepared of the area. No survey was performed, nor were exact measurements taken. Additionally, at the first day of trial, Mr. Silberman had presented a figure of 1.409 acres for the building and driveway square footage, patently inconsistent with his later testimony. On cross-examination, it was apparent that Mr. Silberman measured portions of the land for some purposes and other portions for other purposes. The Moores did not present sufficient evidence to establish that the acreage of the commercial building and driveway network was two acres or less.

For the reasons set forth, this court remands the matter back to the board to recalculate the rollback tax penalty. Accordingly, we enter the following order:

## ORDER

And now, May 5, 2005, after trial held on the appeal of Michael H. Moore and Andrea Wardenski Moore from

the decision of the Berks County Board of Assessment Appeals, and after review of the briefs of the parties and argument, this court affirms in part and reverses in part the Board of Assessment Appeals.

Specifically, the decision of the board terminating preferential use assessment for 62.63 acres located at 120 Old State Road, Alsace Township, Berks County, Pennsylvania, pin no. 22-5338-04-54-7554 (Parcel 1), is affirmed for the years 2000, 2001, 2002 and 2003 and is reversed for the years 1997, 1998 and 1999.

The decision of the board terminating preferential use assessment for 15.88 acres located at Apple Lane, pin no. 22-5338-01-45-2364 (Parcel 2), and 12.43 acres located at Apple Lane, pin no. 22-5338-01-45-5425-001 (Parcel 3), is reversed.

This matter is remanded to the Board of Assessment Appeals for further proceedings to recompute the imposition of rollback taxes for Parcel 1 for the years 2000, 2001, 2002 and 2003. Upon making this determination, appellants, Michael H. Moore and Andrea Wardenski Moore, shall receive a refund of monies paid for all rollback taxes improperly imposed, together with interest on those taxes.